**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
2009 NE Alberta St., Ste. 207
Portland, OR  97211
(503) 525-0193
lacy@onda.org

**Roger Flynn (CO Bar # 21078)** *(Pro Hac Vice Application to be Submitted)*
Western Mining Action Project
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PENDLETON DIVISION**

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N**, **GREAT OLD BROADS FOR WILDERNESS**, and **GREAT BASIN RESOURCE WATCH**, | No. _____ |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| **CASSANDRA ANDREWS-FLECKENSTEIN**, Vale District Manager, BLM, **KIMBERLY PRILL**, Acting State Director, BLM Oregon/ Washington, and **BUREAU OF LAND MANAGEMENT**, | |
| Defendants. | **(Environmental Matter)** |

COMPLAINT

## NATURE OF ACTION

1.      This case challenges the Bureau of Land Management's ("BLM") approval of a mineral exploration project that threatens one of Oregon's most important remaining areas of habitat essential to the survival and recovery of the imperiled greater sage-grouse (*Centrocercus urophasianus*) (hereinafter "sage-grouse"). For thousands of years, sage-grouse have lived in the sagebrush steppe wildlands of southeastern Oregon. The mineral exploration project area, situated at the southern end of Malheur County, Oregon, near the Nevada border, is a sea of sagebrush within the McDermitt Caldera, an ancient volcanic feature bounded by the remote and immeasurably beautiful Trout Creek Mountains and Oregon Canyon Mountains. If it proceeds, this would be the largest mineral exploration project on federal public lands in Oregon's history.



THE MCDERMITT CALDERA IS IN SOUTHERN MALHEUR COUNTY, OREGON, ABOUT 20 MILES WEST OF THE TOWN OF MCDERMITT, NEVADA. IF DEVELOPED, THE CHALLENGED MINERAL EXPLORATION PROJECT WOULD PERMANENTLY CHANGE THIS REMOTE LANDSCAPE, FRAMED HERE BY DISASTER PEAK AND THE TROUT CREEK MOUNTAINS. (PHOTO BY ONDA MEMBER JOHN AYLWARD)

2.    On December 8, 2025, the BLM issued a Decision Record approving an Exploration Plan of Operations authorizing HiTech Minerals, Inc., a subsidiary of an Australian mining company, to undertake drilling, road construction, groundwater pumping, and related lithium exploration activities in a 7,200-acre project area wholly within Oregon about 20 miles west of McDermitt, Nevada. The exploration project area is located entirely on BLM-administered public lands, situated within one of the last and most important intact sagebrush habitats remaining in the West. The authorized activities threaten not only sage-grouse and the dwindling habitat areas they and other sage steppe species rely upon in southeastern Oregon, but also scarce water resources, irreplaceable wildlands, and Tribal and local communities.

3.    BLM's decision will allow HiTech to construct up to 168 drill sites (4,800 square feet each), along with sumps for drilling waste effluent on each drill site (holding about 7,500 gallons of effluent each), 21.5 miles of new access roads, and a 90,000 square-foot equipment staging and laydown area; maintain 44 miles of existing roads; and pump an estimated 18,000 gallons of groundwater per day—although HiTech separately obtained a state water permit authorizing pumping up to 41,250 gallons of groundwater per day. Assuming HiTech pumps the maximum authorized each day of the five-month period (July 1 to November 30) that exploration drilling is allowed, BLM estimates that HiTech will need to pump more than 31.5 million gallons (or 96.84 acre-feet) of groundwater over the five-year life of the exploration project. The map on the following page, taken from BLM's project approval documents, shows the new drill sites (indicated by red circles) and new access roads (indicated in red) authorized by BLM's decision, overlaid on the "Ecostate Categories" of wildlife habitat within the project area. All of the wildlife habitat within the project area is designated as "priority" habitat for sage-grouse

conservation because it includes sage-grouse breeding, brood-rearing, and winter habitat with the

highest value for maintaining sustainable sage-grouse populations.



THE MCDERMITT EXPLORATION PROJECT WILL INCLUDE CONSTRUCTION OF UP TO 168 DRILL SITES
(RED CIRCLES) AND 21.5 MILES OF NEW ACCESS ROADS (RED LINES), AS WELL AS PUMPING AT LEAST
18,000 GALLONS OF GROUNDWATER PER DAY FOR THE DRILLING. THIS MAP ALSO DEPICTS HOW THE
ENTIRE PROJECT AREA IS RELATIVELY INTACT AND HEALTHY SAGEBRUSH HABITAT ("ECOSTATE
CATEGORIES" SHOWN IN GREEN AND LIGHT GREEN), CRUCIAL TO THE SURVIVAL OF SAGE-GROUSE
AND OTHER SAGEBRUSH-DEPENDENT SPECIES, AND ABUTS POOR-QUALITY GRASSLANDS (IN RED)
THAT HAVE BECOME INFESTED WITH WEEDS AND NON-NATIVE ANNUAL GRASSES. (SOURCE:
MCDERMITT EXPLORATION PROJECT ENVIRONMENTAL ASSESSMENT, APPX. A, FIG. 6, "GENERAL
WILDLIFE HABITAT")

4.    The plaintiffs, Oregon Natural Desert Association, Great Old Broads for

Wilderness, and Great Basin Resource Watch (collectively referred to as "ONDA" unless

otherwise noted), have opposed the project from the start, monitoring HiTech's initial

exploration activities starting in 2018 and participating in the BLM planning process since it

began in 2023. They have documented and expressed to BLM serious concerns about the

exploration project and its likely effects on the environment. For example, ONDA highlighted the well-established science indicating that fragmentation and loss of habitat is the main threat to sage-grouse and other species reliant on this currently intact habitat area. During BLM's environmental review process, thousands of people, including ONDA members, local communities, and Tribal members, all expressed overwhelming opposition to the exploration project. Because the project will cause "unnecessary or undue degradation" and "permanent impairment" of public lands, both of which are prohibited under federal law, ONDA urged the BLM to reject the mining company's proposed expanded exploration activities.

5.     In November 2025, before BLM approved the exploration project, ONDA sent the BLM a letter describing new information and concerns about sage-grouse, mule deer, and the impacts of HiTech's road-building activities. Although the local BLM manager (for the agency's Vale District, which administers and manages the public lands on which the exploration project is sited) acknowledged receiving those materials, BLM pressed on with a final decision, issued less than two weeks later, and did not address ONDA's new concerns.

6.     In December 2025, pursuant to BLM's mining regulations, ONDA timely asked the BLM State Director to order additional environmental review. In a letter delivered to ONDA in February 2026, the Acting State Director, Kimberly Prill, denied ONDA's request for State Director review. The State Director's denial contained no explanation of the reasons for her decision.

7.     ONDA and its partners file this action to ensure that the BLM is not permitted to overlook its science-based conservation and land management duties, and its responsibility to ensure informed public decisionmaking, required by law. Accordingly, ONDA seeks relief from this Court to declare unlawful, set aside and vacate the BLM's December 8, 2025 Decision

Record ("DR") and accompanying Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), enjoin the BLM from implementing or otherwise allowing the DR to be implemented, order the BLM to prepare an environmental impact statement or other appropriate new or supplemental environmental review with regard to any portions of the DR/EA/FONSI found by this Court to be adopted arbitrarily, capriciously, in abuse of discretion, or otherwise not in accordance with law.

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–87, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., and the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq*. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–06.

9.      Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, the decision to approve the McDermitt Exploration Project was issued within this district, and the public lands and resources and agency records in question are located in this district.

10.     The federal government has waived sovereign immunity in this action pursuant to the APA. 5 U.S.C. § 702.

//

//

**PARTIES**

11.    Plaintiff **OREGON NATURAL DESERT ASSOCIATION** ("ONDA" as used in this paragraph and the next) is an Oregon non-profit, public interest organization of about 27,000 members and supporters. It has offices in Portland, Oregon and Bend, Oregon. ONDA's mission is to protect, defend, and restore the health of Oregon's native deserts. ONDA actively participates in BLM and Department of the Interior proceedings and decisions concerning the management of public lands in eastern Oregon. ONDA brings this action on its own behalf and on behalf of its members and staff, many of whom regularly enjoy and will continue to enjoy the public lands and resources that are the subject of the final agency decision challenged in this action, for educational, recreational, spiritual, and scientific activities. ONDA has been active in monitoring ecological conditions for the sage-grouse on public lands managed by the BLM throughout eastern Oregon, including within the agency's Vale District and the Project area. ONDA participated throughout the public process that led to the BLM's adoption of the 2025 DR/EA/FONSI. ONDA also sought, but in 2026 was denied, State Director Review pursuant to BLM's mining regulations.

12.    ONDA and its members use and enjoy the waters, public lands, and natural resources on and surrounding the McDermitt Exploration Project area at issue in this case, for recreational, scientific, spiritual, educational, aesthetic, and other purposes. They enjoy fishing, hiking, camping, hunting, bird watching, study, contemplation, photography and other activities in and around these public lands. ONDA and its members also participate in information gathering and dissemination, field surveys and inventories, education and public outreach, participating in agency land use and conservation planning processes, and other activities relating to the BLM's management and administration of these public lands. ONDA and its

members will continue to use the waters, lands, and resources in the project area this year and in the future, and these uses will be irreparably harmed by the exploration project activities.

13. Plaintiff **GREAT OLD BROADS FOR WILDERNESS** is a women-led national grassroots organization that engages and inspires activism to preserve and protect wilderness and wildlife. The Broads maintain a national office in Durango, Colorado, and serve members and supporters throughout the country, including in Oregon. Broads has four chapters, called Broadbands, in Oregon. The Central/Eastern Oregon Bitterbrush Broadband actively participates in BLM and Department of the Interior proceedings and decisions concerning the management of public lands in eastern Oregon. Broads and its members use and will continue to use the waters, lands, and resources in the project area this year and in the future, and these uses will be irreparably harmed by the exploration project activities.

14. Plaintiff **GREAT BASIN RESOURCE WATCH** ("GBRW") is a non-profit organization based in Reno, Nevada, that is concerned with protecting the Great Basin's land, air, water, wildlife, and communities from the adverse impacts of hardrock mining. GBRW members include ranchers, sportsmen, conservationists, and Native Americans dedicated to GBRW's mission. Members of GBRW have used, enjoyed, and valued the exploration project area, including the project site, for many years. Members of GBRW hike, view, and photograph wild plant and animal life, and generally enjoy using the project area for recreational, historical, conservation, and aesthetic purposes. Members of GBRW intend on continuing to use and value the lands in, and affected by, the project area during 2026 and in future years. These uses will be immediately, irreparably, and significantly harmed by the exploration project activities.

15. BLM's failure to comply with NEPA and FLPMA additionally harms Plaintiffs and their members by denying them the right to informed decision-making and full disclosure

under NEPA and FLPMA, as well as the right to meaningfully participate in the decision-making process and management of public lands that affect their above-stated interests and uses.

16.    Defendant **CASSANDRA ANDREWS-FLECKENSTEIN** is sued solely in her official capacity as District Manager of the BLM's Vale District in Oregon. The District Manager is the BLM official responsible for approving the December 8, 2025 DR and McDermitt Exploration Project at issue in this case, and has authority for the actions and inactions alleged herein.

17.    Defendant **KIMBERLY PRILL** is sued solely in her official capacity as Acting State Director of the BLM Oregon/Washington, in Portland, Oregon. The State Director is the BLM official responsible for overseeing approval and implementation of the 2025 DR/EA/FONSI at issue in this case, and for issuing the decision denying ONDA's request for State Director Review pursuant to BLM's mining regulations, and has authority for the actions and inactions alleged herein.

18.    Defendant **BUREAU OF LAND MANAGEMENT** is an agency or instrumentality of the United States, and is charged with managing the public lands and resources governed by the 2025 DR/EA/FONSI at issue in this case, in accordance and compliance with federal laws and regulations.

## STATEMENT OF FACTS

### The McDermitt Caldera

19.    The McDermitt Caldera is a vibrant ecological haven that spans the Oregon-Nevada border in the remote Oregon Canyon Mountains of southeastern Oregon, adjacent to the Trout Creek Mountains. With its uninterrupted, rolling sagebrush hills, the caldera is rich with native wildflowers and bunchgrasses and laced with desert streams essential to the fish and

wildlife that live there. This long, shallow volcanic depression, formed by the Yellowstone hotspot about 16 million years ago, is home to greater sage-grouse, pygmy rabbit, pronghorn, mule deer, golden eagle, and even California bighorn sheep. Flowing through the northern crescent of the caldera, McDermitt Creek's cool waters sustain imperiled Lahontan cutthroat trout, nourish willow-lined banks, and support the vast surrounding sagebrush landscape.

20.    People have lived in and around McDermitt Caldera since time immemorial, relying on the hunting and fishing grounds, traditional and indigenous foods, and water resources present in the Caldera that have been integral to their identity and lifeways and that remain sacred and vitally important to Tribes today. The Shoshone and Northern Paiute people inhabited these lands before European and American expansion into the region in the 19th century. Beginning in the mid-19th century, ranching became one of the main human activities in the area, a multi-generational tradition that continues today. In recent decades, outdoor recreation has become one of the main uses and economic drivers in this area, especially among big game hunters, birders, and hikers. The unique geologic origins of the caldera have produced opal, agate, jasper, and petrified wood that attracts rockhounds.

21.    The McDermitt Caldera is situated within one of the last, best sagebrush strongholds remaining in Oregon's high desert. This ecologically critical landscape is part of the largest expanse of intact sagebrush steppe in North America. Sagebrush (*Artemisia* spp.) ecosystems are among the most vulnerable in North America. Over the past 200 years, sagebrush habitat has declined by nearly half. Today, about 65 million acres of remaining sage-grouse habitat occurs on BLM-managed public lands in the western United States, including about 10 million acres in Oregon. In fact, Oregon is home to much of the sage-grouse's western stronghold—one of just two core areas crucial to the survival and recovery of the species. (The

species' eastern stronghold is centered over Wyoming.) And the McDermitt Caldera is part of this western stronghold.

22.     This landscape is an important part of our national heritage. Of the hundreds of species of fish and wildlife that live in southeastern Oregon, many are sagebrush "obligate" species—meaning they rely upon healthy, intact sagebrush plant communities to provide their food, cover, and seasonal habitats year-round. None are more iconic than the imperiled greater sage-grouse.

23.     Sage-grouse are symbolic of the vast, open lands between the Rocky Mountains and the Sierra Nevada and Cascade ranges. These birds are emblematic of the sagebrush sea of southeastern Oregon's high desert. The species thrives in healthy sagebrush steppe, perfectly attuned to the hardships wrought by dramatic seasonal changes on this landscape. Grouse know where to find wet meadows of succulent wildflowers in late summer and flock to tall sagebrush for food and cover in cold, snowy winters. Every spring, the birds instinctively return, generation after generation, to open areas called "leks" where they engage in spectacular courtship displays. The males fan out their spiked-up tail feathers and make loud popping noises as they inflate and deflate large air sacs on their chests. After choosing a mate, the females then retreat to the protection of the surrounding tall sagebrush to build their nests and raise broods of a half dozen or so chicks.

24.     What the species cannot tolerate is fragmentation and loss of its sagebrush habitats and the erosion of ecosystem health. Sage-grouse are highly sensitive to disturbance and disruption caused by energy development, transmission lines, crop agriculture, livestock grazing, barbed-wire fencing, weeds and invasive plant species, travel networks and motorized vehicles, noise and light pollution—the list goes on. These impacts, further exacerbated by climate change

and altered fire regimes, have had a dramatic, negative effect on sage-grouse populations in Oregon and across the West.

25.    Recovery of functional Wyoming big sagebrush communities—the dominant sagebrush species in the project area—can take half a century or longer. Wyoming big sagebrush grows in lower elevations in southeastern Oregon, where the hotter, drier conditions are unfavorable to sagebrush seeding establishment, and many years can pass before seeds germinate. Drought and competition with invasive plant species can further hamper sagebrush recovery.

26.    Sage-grouse have suffered an 80 percent decline range-wide since 1965, and a nearly 40 percent decline since 2002. These west-wide trends are also reflected in Oregon. State scientists at the Oregon Department of Fish and Wildlife ("ODFW") have estimated that, over the last half-century, sage-grouse have declined by more than 49% in the Trout Creeks core area, where the McDermitt Exploration Project is sited. Federal and state scientists alike understand that the fate of the sage-grouse may be a harbinger for hundreds of other species dependent upon the West's sagebrush habitats. These sagebrush obligate species rely on sagebrush plant communities for all or most of their annual life cycles.

27.    In 2010, the U.S. Fish and Wildlife Service ("FWS") determined that Endangered Species Act ("ESA") protection was "warranted" for the sage-grouse because of loss and fragmentation of sagebrush habitat and the inadequacy of the conservation plans then in place. 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocercus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910, 13,924–62, 13,973–82 (Mar. 23, 2010). Research showed that sage-grouse are affected by habitat disturbance at far greater scales than scientists had previously recognized. Mineral exploration and mining in sagebrush habitats can

result in both direct and indirect (or functional) loss of habitat. *Id*. at 13,948–49. Mineral exploration activities risk water contamination and altering of water regimes, invasion and spread of weeds and other invasive plant species that replace sagebrush, dust that interferes with plant photosynthesis and insect populations critical to young sage-grouse, noise that interferes with sage-grouse seasonal activities and movement across the landscape, and other impacts. *Id*. at 13,949. The FWS's determination prompted the BLM, along with the Forest Service and several states, to develop protections for the sage-grouse to avoid a future ESA listing.

28.     In 2015, the BLM and Forest Service unveiled a series of conservation plans—amending 98 federal land use plans across ten western states—to protect sage-grouse and their sagebrush habitats on public lands throughout the West. 12-Month Findings on a Petition to List Greater Sage-Grouse (*Centrocercus urophasianus*) as an Endangered or Threatened Species, 80 Fed. Reg. 59,858, 59,874–84 (Oct. 2, 2015). These Approved Resource Management Plan Amendments are commonly referred to as the sage-grouse "ARMPAs." The 2015 ARMPA for Oregon amended eight BLM land use plans governing management of about 12 million acres of public land in the high desert and sagebrush steppe east of the Cascade Range. The 2015 ARMPA included limits on development and land use in breeding and nesting areas, special protections for habitat strongholds, science-based monitoring and research, and adaptive management based on those studies. *See Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 823–25 (D. Or. 2022) (overview of sage-grouse conservation planning and the 2015 plans). The overarching goal of the 2015 ARMPA is to implement "conservation measures to protect, restore, and enhance [sage-grouse] habitat by avoiding, minimizing, and compensating for unavoidable impacts of threats on [sage-grouse] habitat." 2015 ARMPA 1-8.

29.     The 2015 ARMPAs represented an historic step forward for sage-grouse conservation. Based on strong conservation measures adopted in the plans, the FWS determined that, at that time, an ESA listing was no longer needed for the sage-grouse. 80 Fed. Reg. at 59,858 (despite continued population declines, "the primary threats to greater sage-grouse have been ameliorated by [Federal and other] conservation efforts"). The FWS claimed that the 2015 plans "represent a paradigm shift in western Federal lands management." *Id.* at 59,875. Then-Secretary of the Interior Sally Jewell described the 2015 plans as an "epic conservation effort." Despite not being listed under the ESA, greater sage-grouse remain a BLM-designated Sensitive Species, which means the bird remains at risk of becoming listed under the ESA.

30.     The BLM adopted further sage-grouse plan amendments (that is, additional ARMPAs) in 2019 and 2025, but neither of those amendments are applicable in this case. The 2019 ARMPA was enjoined and remains so today. *W. Watersheds Proj. v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019). The 2025 ARMPA specifically exempts the HiTech exploration project. As a result, the challenged project is subject only to the provisions of the 2015 ARMPA (in addition to other, existing provisions of the underlying land use plan governing BLM's management of this area, called the Southeastern Oregon Resource Management Plan, or "SEORMP").[1]

31.     The project area is situated within an extraordinarily important core habitat area for sage-grouse. Federal and state agencies have identified and described a number of essential habitat designations relevant to the project area at issue in this case—

---

[1] All prior ARMPA provisions remain in effect unless a particular provision is changed in a successive plan amendment. *Or. Nat. Desert Ass'n v. Raby*, 780 F. Supp. 3d 1085, 1096 n.6 (D. Or. 2025) ("The 2025 ARMPA does not assume a blank slate. Rather, anything that it does not change from the prior ARMPAs remains in effect (subject, of course, to the injunction of the 2019 ARMPA).").

a. In the 2015 ARMPA, the BLM designated sage-grouse Priority Habitat Management Areas ("PHMA"). PHMA are areas that BLM, working in coordination with ODFW, identified as having the highest conservation value to maintaining sustainable sage-grouse populations. These areas include breeding, late brood-rearing, and winter concentration areas. The McDermitt Exploration Project sits entirely within the Trout Creeks PHMA.

b. In the 2015 ARMPA, the BLM also designated Sagebrush Focal Areas ("SFA"). SFA are areas identified by the FWS that represent recognized strongholds for sage-grouse. These areas have the highest densities of sage-grouse and other habitat criteria important for the persistence of sage-grouse. The McDermitt Exploration Project sits entirely within the Trout Creeks SFA.

c. In the 2015 ARMPA, the BLM also identified Strategic Areas including Climate Change Consideration Areas ("CCCA") and High Density Breeding Areas ("HDBA"). BLM defines CCCA as "high elevation (typically above 5,000 feet) with limited habitat disturbance." The agency "identified these areas as likely to provide the best habitat for [sage-grouse] over the long term, according to recent climate change modeling." BLM defines HDBA as areas of "high quality habitat with a high density of active sage-grouse leks." The McDermitt Exploration Project sits entirely within a BLM-identified CCCA and a BLM-identified HDBA.

d. Priority Areas for Conservation ("PAC") are core sage-grouse habitats which have been geographically divided to represent biologically significant management units for Oregon's sage-grouse populations. This term was

introduced by the FWS to encompass the most important areas needed for maintaining sage-grouse representation, redundancy, and resilience across the landscape. The McDermitt Exploration Project sits entirely within core habitat identified by ODFW and FWS in the Trout Creeks PAC, which contains one of the highest densities of leks in the state of Oregon.

HiTech Authorized Drill Sites and Greater Sage-Grouse Habitat



THE MCDERMITT EXPLORATION PROJECT AREA IS SITED IN A CRITICALLY IMPORTANT CORE SAGEBRUSH HABITAT AREA. THIS MAP ILLUSTRATES THAT THE ENTIRE PROJECT AREA IS CORE SAGE-GROUSE HABITAT SITUATED WITHIN 4.0 MILES OF SAGE-GROUSE LEKS. SOME NOTICE-LEVEL AUTHORIZED DRILL SITES, CIRCLED ON PINK ON THE MAP, WERE NOT DISTURBED DURING NOTICE-LEVEL EXPLORATION AND SO WILL REPRESENT NEW SURFACE DISTURBANCE CAUSED BY THE MCDERMITT EXPLORATION PROJECT. (MAP ADAPTED FROM ANALYSES PROVIDED BY ONDA TO BLM DURING THE NEPA PROCESS)

32.     The McDermitt Exploration Project will also affect a number of other unique and imperiled species. These include—

    a.  *Pygmy rabbit*: Like the sage-grouse, pygmy rabbit is a sagebrush obligate species. The world's smallest leporid, pygmy rabbits have small home ranges and limited dispersal, influenced by very specific habitat requirements for tall, dense sagebrush and deep, loose soils in which they can dig their burrows. They are one of only two rabbits in North America that dig their own burrows. The pygmy rabbit is protected as a BLM-designated Sensitive Species and a state-sensitive species and Species of Greatest Conservation Need in Oregon. In 2024, the FWS determined that the pygmy rabbit may warrant listing as an endangered species. Thus a "candidate species" for ESA listing, BLM policy requires the agency to ensure that any actions it approves or carries out on public lands do not contribute to the need for the species to be listed. The McDermitt Exploration Project area falls within a corridor connecting an isolated pygmy rabbit core habitat area to a larger essential habitat area in southeastern Oregon. Baseline studies identified at least one active pygmy rabbit burrow in the project area.

    b.  *Mule deer*: Characterized by their large ears and black-tipped tails, the Trout Creek herd of mule deer that live in and around the McDermitt Exploration Project area are uniquely non-migratory, or exhibit short-distance elevational migrations. The project area is important winter range for mule deer, which rely on shrubs, including sagebrush, to survive southeastern Oregon's harsh winters. Mule deer tags are highly coveted by hunters in eastern Oregon, and mule deer-related recreation, including hunting and wildlife viewing, provides important

economic benefits to Oregon with a significant portion realized in eastern Oregon rural counties. Mule deer are sensitive to changes in habitats and environmental conditions. For example, road construction, use, and density associated with mining exploration activities affects mule deer populations and life cycles.

c. *Pronghorn*: The fastest land mammal in the Western Hemisphere, pronghorn have oversized hearts and lungs to take in large gasps of oxygen, spring-like padded hooves to absorb rocky terrain, and large eyes with a 320° field of vision to spot predators from afar. They are often referred to colloquially as "pronghorn antelope," although they are not actually an antelope species. Pronghorn prefer open terrain in sagebrush steppe, like the McDermitt Caldera, and they use vast migratory routes, generation after generation, sometimes traveling more than 100 miles between summer and winter ranges to find available food sources. Nearly the entire McDermitt Exploration Project area is classified by ODFW as "Category-2 Habitat" for pronghorn and mule deer. In Category-2 Habitat, ODFW recommends avoiding habitat disturbance and, for any proposed development actions, mitigation that provides a net benefit of habitat quality or quantity.

d. *Lahontan cutthroat trout*: This native fish is listed as a threatened species under the ESA. Lahontan cutthroat trout ("LCT") survive in just a handful of disconnected, internally drained river basins in southeastern Oregon, northern Nevada, and northeastern California. They require very cold, clean water, and are highly sensitive to human disturbance, including disturbances associated with mining activities. McDermitt Creek and its tributaries provide essential habitat for

LCT. Notably, ODFW, FWS, local stakeholders, and private landowners have invested decades into conserving and restoring LCT in McDermitt Creek and its tributaries. The federal government helped the Western Rivers Conservancy purchase the Disaster Peak Ranch to protect 18 miles of LCT habitat in McDermitt Creek and key tributary streams, spending $2.7 million from the Cooperative Endangered Species Conservation Fund to support local and rangewide recovery.

33.    All of these species rely on and benefit from the remote and relatively untrammeled nature of the project area. While surrounding lands have been affected by wildfires and are infested with weeds and other non-native plants, like cheatgrass, the McDermitt Exploration Project area is characterized by relatively intact and healthy sagebrush steppe. There are no paved roads in the project area and very few primitive routes save for an access road, maintained for a short distance before turning into a dirt road, and a handful of two-track jeep trails.

34.    Creeks and natural springs breathe life into this high desert landscape. McDermitt Creek and its tributaries provide essential habitat for LCT, support adjacent upland areas, and have been the focus of extensive restoration activities over the past few decades by state and federal agencies, local landowners, and public lands users. The waters in Payne, Mine (also known as Hot), Cherokee, Turner, and upper McDermitt creeks provide important hydrologic inputs to the mainstem McDermitt Creek. In addition to these surface waters, groundwater is also essential to a functioning ecosystem. The surface and groundwater supplies in the McDermitt Caldera also provide crucial drinking water and stock water for local communities.

**The McDermitt Exploration Project**

35.     The Mining Law of 1872 made certain mineral deposits in land belonging to the United States open to exploration and purchase, "under regulations prescribed by law" to protect federal interests. 30 U.S.C. § 22. The law provides citizens of the United States the opportunity to explore for, discover, and develop certain valuable mineral deposits on federal lands that are open to mineral entry.

36.     HiTech began staking claims and conducting preliminary, Notice-level mining exploration in the McDermitt Caldera in 2018. Under this initial "Notice" phase of drilling, a mining operator may disturb no more than five acres of land at a time. It must reclaim disturbed areas before moving on to explore other claims. HiTech conducted Notice-level exploration throughout the project area between 2018 and 2025. HiTech was not required to submit a plan of operations for the Notice-level exploration, and BLM did not provide any opportunities for public comment on these operations. However, Notice-level exploration must comply with performance standards specified in 43 C.F.R. § 3809.420, including compliance with all state and Federal laws, including BLM land use plans.

37.     HiTech's Notice-level exploration has been out of compliance with state and federal requirements and failed to comply with basic requirements for conservation of public land resources several times since they began exploratory drilling in 2018. In 2021, for example, ONDA wrote to the BLM to express concern that HiTech's exploration drilling activities had proceeded based upon inaccurate information regarding sage-grouse and their habitat use. HiTech had claimed that the closest lek to any of its drill sites was a half-mile away, and all of its other holes were a mile from the nearest known lek. In fact, HiTech had omitted several known sage-grouse leks from its maps, and there were a number of drill hole sites within a mile of sage-

grouse leks, including one site that was just 1,000 feet from a lek. This was concerning because sage-grouse are extremely sensitive to habitat disturbance including from noise and loss or fragmentation of habitat.

38.    In 2022, HiTech continued not to be able to comply with basic exploration activities described in the Notice. HiTech exceeded the 14-foot maximum allowed width for overland travel routes, mechanically maintained overland routes even though that was not provided for in the Notice, constructed well pads significantly larger than what was outlined in the Notice, and constructed more sumps than were described in Notice modifications. BLM sent HiTech a noncompliance letter with a list of corrective actions needed to resolve the noncompliance issues.

39.    In August 2022, HiTech submitted a draft Exploration Plan of Operations ("EPO") to the BLM, seeking authorization to expand the company's mineral exploration activity above the Notice level. After a series of three additional revisions to the draft EPO based on comments to HiTech from BLM and other agencies, including FWS, the BLM deemed the EPO complete in April 2023. FWS's comments expressly advised the company that potential impacts from the proposed exploration activities would not be limited only to directly affected areas, particularly with respect to the introduction and spread of noxious weeds and nonnative plant species. In other words, the proposed exploration drilling threatened not just direct, but also indirect, effects, which can result in the "functional loss" of sage-grouse habitat.

40.    In June 2023, in preparing a wilderness-related amendment to the land use plan (the SEORMP) that governs BLM's management of the public lands in and surrounding the project area, the agency stated that that "[t]he BLM will initiate an environmental impact statement (EIS) for the proposed [HiTech] exploration project in 2023." This made sense

because, under NEPA, an EIS is required for any action that may significantly affect the quality of the human environment. Only for actions where there will be *no* significant environmental effects can an agency instead prepare a more abbreviated EA.

41.    In July 2023, BLM opened a public scoping period for the McDermitt Exploration Project. Scoping is a required, essentially issue-spotting, process that continues throughout the planning and early stages of preparing a NEPA review. *See* 43 C.F.R. § 46.235 ("NEPA scoping process"). BLM accepted scoping comments from the public through September 15, 2023.

42.    ONDA and partners, including Great Old Broads for Wilderness, submitted a scoping comment letter dated September 15, 2023. Great Basin Resource Watch submitted its own letter that same day. The letters expressed concerns about impacts from expanded exploratory drilling to wildlife, waters, wildlands, and other important resources in the McDermitt Caldera. Given the likely significant impacts of the project, ONDA asked the BLM to prepare an EIS—as the agency had indicated it would, in the SEORMP NEPA documents earlier that year. Among other concerns, the groups highlighted potential impacts to sage-grouse and other sagebrush obligate birds, pygmy rabbit, pronghorn, mule deer, golden eagle, Lahontan cutthroat trout, insects and invertebrates, and a number of sensitive plant species including king's rattleweed, broad-keeled milkvetch, and Cooper's goldflower.

43.    For example, the groups highlighted potential impacts to ODFW-identified Priority Wildlife Connectivity Areas. These are biological corridors connecting habitat areas crucial to dozens of wildlife indicator species including sage-grouse. They noted that the project area would bisect an important corridor connecting the Trout Creek Mountains and lower McDermitt Creek. And they highlighted dozens of provisions from the BLM's controlling land use plan for the area, the SEORMP, as amended by the 2015 ARMPA, that require the agency to

conserve and protect sage-grouse habitat on these public lands. FLPMA and BLM mining regulations, 43 C.F.R. Part 3809, require BLM to ensure its project decisions are consistent with all such land use plan requirements, as well as all other applicable Federal and state laws.

44.     In their scoping letters, the groups also expressed concern that the project risked resulting in the establishment and spread of weeds and other invasive plant species that out-compete and replace native sagebrush plant communities. Invasive annual grasses, like cheatgrass, thrive on disturbed sites like roads and mine exploration drill sites. These invasive annual grasses are also one of the leading causes of more frequent and severe wildfires in the West, including southeastern Oregon. The project area is largely characterized by intact and healthy sagebrush plant communities, with only about 5% cover of nonnative species. Weed and non-native plant infestations would dramatically degrade the area's ecological health. This is a significant concern because the most recent data indicate that much of the project area is characterized as having "low" resistance and resilience against nonnative species after disturbance. Combined with the latest threat-based ecostates data, this underscores the fragile ecology of the project area. (Ecostate maps connect the concept of threat-based land management with the power of satellite technology and on-the-ground vegetation measurements to characterize patterns and trends of landscape-scale threats. They show where sagebrush landscapes are still functioning well, where they are in trouble, and what threats are driving the change. These powerful maps allow land managers to make informed, science-based management decisions. For example, the map reproduced after ¶ 3, above, shows ecostate categories for the public lands within and surrounding the project area.)

45.     The groups also expressed concern about water-related issues. For example, they noted that the proposed mine exploration activities would release toxic heavy metals as drill bits

are bored into underlying bedrock. Sampling conducted in McDermitt Creek from 2017 to 2019 by the U.S. Geological Survey found concentrations of arsenic that exceeded the federal drinking water standard. Similarly, in 2002, the EPA detected significant concentrations of arsenic in Hot Creek, both upstream and downstream of the McDermitt Exploration Project area. This was left over from the abandoned Opalite Mine located directly north of the McDermitt Exploration Project area.

46.      The groups also expressed concern that HiTech's proposal to use tens of thousands of gallons of water per day for its operations would significantly impact surface and groundwater availability in the area. The state of Nevada has determined that the perennial yield of the Quinn River Valley basin, into which McDermitt Creek and its tributaries flow, is 60,000 acre-feet per year. (One acre-foot of water is equivalent to about 325,000 gallons.) "Perennial yield" means the maximum amount of groundwater that can be pumped from a basin each year over the long term without depleting the groundwater reservoir. Current groundwater usage in the Quinn River Valley basin is about 82,261 acre-feet per year. Because groundwater is already over-appropriated in the Quinn River Valley basin, the Nevada Division of Water Resources— for the last four decades—has denied applications seeking permission to make additional groundwater withdrawals. It is virtually impossible that HiTech will be able to use the water it needs to conduct its exploration activities (let alone any eventual open pit mine development, which would require many times more water than exploratory drilling) without causing significant environmental impacts. Total groundwater in the basin also has continued to decline over the past four decades, largely due to climate change. The BLM omitted much of this information from its EA and said that effects on water quantity "would be negligible, short-term, and localized."

47.    Also during the scoping period, the BLM received comments from FWS and ODFW. FWS described that the BLM had not effectively monitored or enforced compliance of Notice-level exploration activities, and that this had resulted in "unnecessary or undue degradation" from the approximately four acres of direct disturbance caused by the Notice-level exploration activities. FWS informed BLM that this included adverse impacts to wildlife, ground and surface waters, and riparian and sagebrush vegetation within and outside the project area. The FWS described that these impacts included effects to an array of species and would likely have permanent ramifications on the area's wildlife and habitat resources. Similarly, ODFW described in its comments that "restoration of complete habitat function to pre-disturbance levels will likely take decades" and recommended BLM "[a]nalyze the long-term impacts to wildlife habits due to habitat fragmentation."

48.    In October 2023, the Trout Creek Mountain Working Group hosted a field tour of the project area to review HiTech's reclamation activities. The Trout Creek Mountain Working Group is a group of livestock owners, conservation organizations, government agencies including the BLM, and other interested parties, who have been collaborating to address land use and environmental issues—particularly riparian issues—in this area since 1988. The Working Group discussed that HiTech's reclamation activities to date had been insufficient. Sites "released" from Notice-level exploration (so that HiTech could conduct exploration at new sites but stay within the Notice-level threshold of no more than five disturbed acres in total across the project area) had not been adequately reclaimed. For example, some drill sites were infested by weeds, rather than being properly reclaimed with native plant species, and some sumps were filled in with a rock layer on top of the soil that will be impossible to reclaim with future seedings.

49.     Four other mineral exploration and mining projects are also being developed in the McDermitt Caldera: the Aurora Energy Metals Project, the Resurgent Lithium Project, the McDermitt East Lithium Project, and the large Thacker Pass Lithium Mine. In a September 15, 2023 letter to BLM, ONDA requested that BLM, in its NEPA review for the McDermitt Exploration Project, fully analyze the cumulative impacts from the nearby open pit Thacker Pass Lithium Mine. BLM failed to do so.

50.     By letter dated December 15, 2023, ONDA again asked the BLM to ensure its NEPA analysis included a review of the cumulative impacts of these ongoing projects when added to or combined with the impacts of the McDermitt Exploration Project. All of these other, reasonably foreseeable projects were in Notice-level status at that time (except for the Thacker Pass Lithium Mine, which BLM had approved in 2021). ONDA highlighted the mapped boundaries and drill hole locations for the projects in relation to the McDermitt Exploration Project. ONDA also provided copies of some of the key scientific publications it had referenced in its September 2023 letter. BLM failed to do so.

51.     On March 26, 2025, instead of reviewing the significant impacts from the McDermitt Exploration Project in an EIS, as BLM had previously stated was necessary, BLM instead issued a draft EA for the project (DOI-BLM-ORWA-V000-2023-0045-EA) to evaluate impacts from HiTech's EPO.

52.     BLM's decision to proceed with an EA rather than an EIS stands in stark contrast to other mineral exploration projects BLM recently analyzed. For example, for the Mojave Precious Metals exploratory drilling project in California, which involved only 26 acres of direct disturbance (compared with 73 acres of direct disturbance in the McDermitt Exploration Project)

and use of only 9 acre-feet of groundwater (compared with 96.84 acre-feet at McDermitt), BLM found an EIS was required and imposed significant constraints on project operations.

53.    The BLM's April 2026 Record of Decision and Final EIS for the Mojave Precious Metals project, requires, among other things, that the drilling be conducted via helicopter access only to protect sensitive public land resources (unlike the extensive road construction and maintenance approved in the McDermitt project).[2]

54.    In its rush to approve the McDermitt Exploration Project, BLM set a mere 5-day public comment period—offering just three business days for a project that had been in process for years. By letter dated March 27, 2025, ONDA expressed concern that such truncated review would impede public participation. ONDA asked BLM to extend the comment period. BLM relented and extended the comment deadline a short while longer, to April 25, 2025.

55.    In the meantime, under White House "emergency" procedures curtailing public environmental reviews for certain projects, the McDermitt Exploration Project was included, on April 18, 2025, among the first batch of "critical minerals" projects put on the Federal Permitting Improvement Steering Council's FAST-41 Transparency Projects list. The McDermitt Exploration Project is not, however, on the list of FAST-41 Covered Projects. FAST-41 Covered Projects benefit from streamlined federal environmental reviews and permitting. The McDermitt Exploration Project did not receive streamlined federal environmental review and permitting under FAST-41.

---

[2] BLM, Record of Decision for the Mojave Exploration Drilling Project Inyo County, California DOI-BLM-CA-D050-2023-0003-EIS, https://eplanning.blm.gov/Project-Home/?id=77b33ad7-a7f2-f011-8407-001dd803d067 (April 2026).

56.    Despite the short and chaotic public comment period afforded by the BLM, the agency received 2,295 comments on the draft EA. These public comments expressed a wide array of significant environmental and other concerns.

57.    ONDA and its partners, including Great Basin Resource Watch and Great Old Broads for Wilderness, reviewed the draft EA and provided detailed public comments by letter dated April 25, 2025. As they did with their earlier comments, the groups also provided detailed maps and spatial analyses, data and photographs, copies of dozens of important scientific publications, and other relevant materials. Essentially all of the concerns raised in ONDA's comment letter were issues the groups had already sought to bring to BLM's attention in their scoping comments the previous year.

58.    In its abbreviated EA, the BLM limited its analysis of project impacts to just four resource values: cultural resources, sensitive plant species, sage-grouse, and water resources, despite the public comments detailing far more extensive impacts. The agency's "environmental consequences" discussion for each of those four resources was extraordinarily abbreviated. Buried deep in a sub-appendix to one of the EA's ten appendices, BLM included a section titled, "Issues Analyzed in Brief." That section consists of scattered and truncated presentations of a host of other important public lands resources and values that the public had asked BLM to study in detail. For example—

      a.  BLM acknowledged that pygmy rabbit, a BLM-designated Sensitive Species in Oregon, is present in the project area, and that the entire project area falls within a Pygmy Rabbit Connectivity Corridor; yet, it includes just two paragraphs that make up the BLM's entire consideration of the environmental consequences of

the project to pygmy rabbit. There is even less discussion for species like mule deer and pronghorn.

b. BLM's abbreviated discussion of noxious weeds and invasive, nonnative plant species is similarly insufficient and contradictory. BLM claims that only 73 acres, or 1% of the project area, would be impacted—that is, only the *directly* disturbed areas—yet also seems to acknowledge that vehicle traffic carrying invasive plant seeds would disperse invasive plants to other areas traveled throughout the project area.

c. BLM's discussion of soils is similarly insufficient. The sub-appendix briefly and solely focuses on soil erosion. There is no discussion of how soil disturbance affects the potential for revegetation—which is a crucial concern given how many decades it takes for native plants like Wyoming big sagebrush to establish and grow. BLM had previously acknowledged, in its 2024 NEPA review for a land use plan amendment related to wilderness management, that mineral exploration and mining activities "cause soils disturbance and typically removes the topsoil, resulting in slow or no revegetation." Soils are central to ecosystem health and are among the most fragile of natural resources. Rates of soil formation may vary from anywhere between half a century to thousands or even tens of thousands of years.

d. In the sub-appendix's brief description of impacts to upland vegetation, BLM acknowledges that disturbance has the potential to increase the density of invasive species within and outside the area of ground disturbance, and would lead to a change in vegetation composition and cover which would alter the existing

ecosystem, both in the short- and long-term. Again, though, there is no actual analysis of these impacts, and BLM's observations are limited to the 73 acres of direct impacts, ignoring the many thousands of acres of surrounding areas within and outside the project area that would be indirectly affected by the approved mineral exploration activities.

e. The sub-appendix fails to include a section on impacts from the 44 miles of existing and 21.5 miles of new roads authorized for the project. Roadless areas are critical to the health of functioning sagebrush ecosystems, and roads and primitive routes are devastatingly effective at establishing and spreading weeds and other invasive plant species. Cheatgrass, for instance, is strongly associated with roads and primitive motorized routes, where regular ground disturbance from travel and maintenance activities confer a competitive advantage over native species. From disturbed roadways and trails, invasive annual grasses can colonize adjacent habitats. Development and maintenance of roads results in habitat loss and fragmentation and may cause sage-grouse habitat avoidance. In arid high desert landscapes like the McDermitt Exploration Project area, it can take many decades to reclaim or rehabilitate a road once developed on the ground. In its comments, ONDA had provided, for example, a photograph depicting a noticeable difference in condition on an existing primitive route past a drill site:

//

//

//

//



MCDE_5698

*Evidence of exploration activities are substantially noticeable along a route widened by drilling equipment and vegetation removed. Note the significant difference in condition of the route and surrounding landscape at the top of the photo where drilling equipment did not travel. Photo was taken on October 19, 2022. Photos: ONDA*

The road up to the drill site was widened and vegetation removed while the road beyond (untouched by equipment) was a typical two-track. BLM failed to assess this concern in its EA.

59.    The EA's discussion of impacts to surface and groundwater resources was meagre. BLM failed, for example, to calculate and disclose the potential drawdown that would result from authorized pumping that will occur for five months of the year for five years. Without that information, BLM had no way of assessing the impacts to natural springs in and around the project area. BLM also significantly underestimated water resource impacts by failing to accurately estimate recharge, including by ignoring surface gaging stations at McDermitt Creek and Quinn River, thus greatly overstating the perennial yield of water available in the

project area. And because McDermitt Creek and its tributaries are fed by numerous springs and seep areas, BLM's failure to assess such seepages during baseflow periods left the agency with an inadequate understanding of what portions of streams would become dry or have less flow due to dewatering associated with the project. (Mineral exploration drilling requires significant amounts of water.) BLM does acknowledge that one spring downstream of the project area has a water chemistry and temperature similar to that of the groundwater, unlike other springs outside the project area. This spring represents a connection to groundwater and potentially to a deeper aquifer; yet the EA failed to analyze how drawdown would affect the flowpath through the aquifer to the spring. Instead, BLM focused its analysis on direct impacts of water flows into Mine and McDermitt creeks. In its EA, BLM simply "assumed" that groundwater and surface water had "little to no connection" in the project area.

60.     This failure is also problematic given that the Oregon Department of Environmental Quality has listed McDermitt Creek and Cherokee Creek as "303(d)" impaired waters under the Clean Water Act for fish and aquatic life due to elevated water temperatures. Despite BLM's lack of critical baseline information on water resources and the already-impaired condition of waters in the project area, and despite the significant amount of water (41,250 gallons) that HiTech is authorized by the State to pump every day for the exploration project, the BLM concluded that there would be no significant impacts to groundwater or surface water, although the agency claims to have analyzed the impact of pumping the 41,250 gallons per day authorized by the state permit.

61.     The EA scarcely mentions mitigation, and it fails to analyze the likely (or unlikely) effectiveness of the smattering of mitigation measures that do appear, or to disclose that those few measures were the same as HiTech had applied—unsuccessfully—in its Notice-

level exploration activities. The EA offers a hopeful guess that vague, undeveloped, and indeterminate mitigation measures will be effective, even though they had previously been unsuccessful at the Notice-level exploration stage (as ONDA had highlighted in a November 24, 2025 letter to BLM, further described below).

62.     The BLM also failed to ensure, as required by the 2015 ARMPA, that it provide for a "net conservation gain" for any action that results in sage-grouse habitat loss and degradation. The 2015 ARMPA "net conservation gain" requirement applies to the McDermitt Exploration Project. The FLPMA requirement that BLM prevent "unnecessary or undue degradation" also creates a responsibility for the BLM to specify necessary mitigation measures when approving mining plans.

63.     As time passed, important new information came to light. By letter dated November 24, 2025, ONDA drew BLM's attention to significant new circumstances and information that had arisen since BLM issued its EA for the project the previous March. First, concerns over impacts to sage-grouse had continued to mount. Sage-grouse are extremely sensitive to disturbance. They will avoid areas they once used if those areas have been altered by anthropogenic features—including constructed or improved roads and other activities associated with mineral exploration and mine development. A new dataset showed that much of the project area was rated as highest quality sagebrush steppe habitat that should be prioritized for protection (not destruction). The healthy habitat of the McDermitt Exploration Project area is especially notable when considering the ecological condition of the surrounding landscape, which was burned in the 2012 Holloway Fire and is largely comprised of poor condition grassland (as the map in ¶ 3, above, illustrates). Similarly, new data also showed that the entire project area is classified as "low resilience" and "low resistance." This means that, once disturbed, these fragile

areas will be exceedingly difficult to restore, particularly given that any recovery of sagebrush to pre-disturbance conditions would likely take *at least* a half-century.

64.    In its November 24, 2025 letter, ONDA also highlighted new published science on mule deer which indicates that impacts from the proposed exploration project would significantly interfere with their use of the area. And ONDA shared a series of ground-based photographs it collected showing how HiTech's reclamation efforts following Notice-level drilling had fallen short. The photographs showed that vegetation alongside drilling routes did not meet HiTech's own reclamation standards. Among other problems, cheatgrass infestations were starting to take hold in previously healthy sagebrush areas. Cheatgrass is an invasive plant that quickly spreads in disturbed soil; as it does so, cheatgrass outcompetes native plants and also provides a continuous fuel source that promotes the ignition and spread of large fires—resulting in serious, long-term, and irreparable damage to sagebrush plant communities. ONDA urged the BLM to reject the proposed McDermitt Exploration Project plan of operation and re-open it for additional analysis and public input to consider the important new information ONDA had identified.

65.    On December 3, 2025, BLM acknowledged receiving the letter, but did not re-open the NEPA and FLPMA review process, and ignored this significant information. There is no indication in the DR, final EA, or FONSI that BLM considered the new information ONDA had provided in its November 24, 2025 letter. A reference list in Appendix J to the final EA, identifying the new information ONDA provided as "Literature Considered but Not Cited," appears to simply cut-and-paste the "References Cited" list in ONDA's letter. Nowhere in its final EA (or the DR or FONSI) is there evidence BLM actually "considered" this material.

66.    On December 8, 2025, the BLM issued a Decision Record, Finding of No Significant Impact, and Final EA for the McDermitt Exploration Project. The decision authorizes HiTech to conduct lithium exploration activities in a 7,200-acre project area about 20 miles west of McDermitt, Nevada, in Malheur County, Oregon. Under the approved exploration plan, HiTech will construct up to 168 drill sites with sumps to collect drilling waste effluent, 21.5 miles of allegedly "temporary" access roads, and one equipment laydown area; maintain 44 miles of existing roads; pump an estimated 18,000 gallons of groundwater per day, although HiTech is authorized by the state to pump up to 41,250 gallons of groundwater per day; and install an upgraded weather station. Activities will occur seasonally (July 1 to November 30) and will be "phased" by conducting reclamation concurrently with exploration.

67.    No baseline information about the current condition of the roads to be maintained is included in the Final EA, and many of the environmental impacts described therein are classified as "temporary." Some of the roads authorized to be used as part of the project are not included in BLM's Ground Transportation (GTRN) dataset. The GTRN dataset lists all existing roads, trails, and transportation features on BLM-managed public lands in Oregon. Other routes authorized to be used as part of the project are obscure, meaning they are faint or invisible on the ground. Using these and other motorized routes approved under BLM's exploration decision will cause significant impacts that, because of the incomplete and inaccurate baseline information in the EA and associated NEPA documents, were not disclosed for meaningful public review and informed agency decisionmaking.

68.    BLM describes that the plan will only result in 73 acres of disturbance. In fact, the environmental impacts will be far more wide-ranging within the 7,200-acre project area and in sage-grouse habitat surrounding the project area, particularly as sagebrush habitat is degraded

and fragmented. For example, despite observing that sage-grouse are a "landscape species" that requires large, interconnected patches of sagebrush, in areas with little human disturbance, the BLM focused its NEPA and FLPMA analysis only on direct impacts from the 73 acres of roads and drill sites. BLM claimed that, because surface disturbance would be "phased and reclaimed concurrently," habitat fragmentation effects would not be significant. This ignores the fact that the entire, 7,200-acre project area will essentially be an industrial mineral operation for years. In turn, this ignores that sage-grouse will suffer a "functional loss" of habitat in the entire project area and in the priority "core" habitat surrounding it.

69.    The EA's myopic focus on direct impacts ignored the rich scientific literature on effects from human activities that subdivide continuous habitats into smaller components. As landscapes become broken into smaller patches of habitat, functional connectivity is lost. According to experts at the FWS, "fragmentation results in functional habitat loss for greater sage-grouse even when otherwise suitable habitat is still present." Yet, despite the critical importance of functional habitat loss, BLM did not study this concept in the EA. Rather, the EA's analysis of habitat that will be impacted focused on direct, project "footprint" impacts, eliding meaningful discussion of the crucial, indirect harm caused by habitat fragmentation.

70.    In addition to running afoul of NEPA's and FLPMA's requirements that BLM undertake meaningful and robust analyses of the environmental consequences of proposed actions, and to use reliable scientific information and analysis, this also contradicts BLM's recognition that, under its FLPMA mandate to "prevent unnecessary or undue degradation" to public lands, 43 U.S.C. §1732(b), the agency must consider the impacts of mineral exploration operations beyond the immediate disturbed areas.

71. BLM has recognized that its "authority is to take any action necessary to prevent unnecessary or undue degradation to public lands. This includes lands within and outside of the project area." Mining Claims Under the General Mining Laws; Surface Management, 65 Fed. Reg. 69,998, 70,045 (Nov. 21, 2000) (preamble to BLM mining regulations, revised on other issues in 2001). "However, it should be noted that impacts from mining operations and many other activities on public lands cannot be confined exclusively to the area of direct surface disturbance. Impacts to many resources transcend the direct disturbance boundary due to the nature of the effect. Visual impacts can often be seen for miles. Noise from operations can be heard a good distance from the project area. Wildlife may be displaced." *Id.*

72. BLM also failed to ensure compliance with many of its own land use plan requirements for sage-grouse conservation. For example, the 2015 ARMPA (MD SSS-11)[3] requires that "activities disruptive to [sage-grouse] shall not occur in seasonal [sage-grouse] habitats unless the project plan and NEPA document demonstrate the project will not impair the life-cycle or behavioral needs to [sage-grouse] populations." The delineated seasonal avoidance periods are for breeding habitat (March 1 to June 30), brood-rearing habitat (July 1 to October 31), and winter habitat (November 1 to February 28). BLM will allow drilling during the brood-rearing season, and it will allow disturbance-causing maintenance, monitoring, and other activities during all seasons. BLM provided no map of seasonal habitats in its NEPA documents, so it is impossible for the public to assess whether it would even be possible to comply with this requirement. The EA and decision documents do not "demonstrate" that project activities will not impair sage-grouse life-cycle and behavioral needs.

---

[3] "MD" in the 2015 ARMPA stands for "Management Decision." These are the land use plan decisions contained in the 2015 ARMPA with which all future site- or project-specific resource authorizations and actions in sage-grouse habitat must conform to or be consistent with. 43 U.S.C. §1732(a).

73.     As another example, the 2015 ARMPA (MD SSS-10, MD SSS-13, MD MR 11) requires BLM to ensure mitigation that provides a "net conservation gain" for any action that results in sage-grouse habitat loss and degradation. However, BLM has only required HiTech to "avoid and minimize effects to [sage-grouse]," work with ODFW to "identify any residual project impacts to sage-grouse" and "calculate a compensatory mitigation requirement to offset loss of sage-grouse habitat," and ensure "that [sage-grouse] is not unduly disturbed." This "no net loss" mitigation requirement is inconsistent with—because it is weaker than—the "net conservation gain" required under BLM's land use plan as amended by the 2015 ARMPA.

74.     By letter dated December 22, 2025, pursuant to 43 C.F.R. § 3809.805, ONDA asked the BLM Oregon/Washington State Director to withdraw the December 8, 2025 Decision Record for further NEPA and FLPMA analysis, public input, and preparation of a revised or supplemental NEPA document, including to consider the significant new information ONDA had brought to the BLM's attention in its November 24, 2025 letter. Hearing no response, ONDA, by further letter dated February 20, 2026, asked the BLM State Director when ONDA could expect a response to its State Director Review request. By email dated February 24, 2026, the BLM provided a copy of a letter in which the State Director had "denied" ONDA's request. The letter provided no explanation or reasoning for the denial.

75.     Lacking further recourse, ONDA thus filed this lawsuit.

//

//

//

//

//

COMPLAINT
- 38 -

## FIRST CLAIM FOR RELIEF
## VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT

### THE 2025 DR/FONSI/EA IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND NOT IN ACCORDANCE WITH LAW

76.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

77.    NEPA is our basic national charter for protection of the environment. It is intended "to promote efforts which will prevent or eliminate damage to the environment and biosphere" and "enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. It "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

78.    NEPA's "action-forcing" procedure serves two purposes: (1) informed agency decisionmaking and (2) meaningful public participation. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). The obligation to disclose information about environmental impacts is central to NEPA's core principle of "democratic decisionmaking." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099, 1121 n.24 (9th Cir. 2010).

79.    Agencies must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An "EIS must be prepared if substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor." *Blue Mtns. Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (internal quotation marks omitted). The bar for whether significant effects may occur is a "low standard." *See, e.g.*, *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*,

631 F.3d 1072, 1097 (9th Cir. 2011); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

80.    Actions that will have no significant environmental impacts do not require preparation of an EIS and can be supported by an EA and FONSI. *See* 42 U.S.C. § 4336(b)(2). Only if an action will have *no* significant impacts can an agency decline to prepare an EIS. A decision not to prepare an EIS must be "based on a consideration of the relevant factors" and "provide[] a convincing statement of reasons why a project's impacts are insignificant." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (quoting *Nat'l Parks & Cons. Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001)); *see also Blue Mtns.*, 161 F.3d at 1212.

81.    NEPA requires federal agencies to take a "hard look" at the environmental consequences of their proposed actions. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (both discussing the "hard look" requirement). To accomplish this, federal agencies must study the environmental impacts of proposed actions, reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment, and any irreversible and irretrievable commitments of resources. 42 U.S.C. § 4332(2)(C). Agencies must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and "make use of reliable data and resources." *Id*. § 4332(2)(D), (E).

82.    NEPA requires agencies to establish, disclose, and analyze accurate *environmental baseline conditions* of the affected environment. Establishing an accurate environmental baseline is a fundamental requirement of the NEPA process because an inadequate baseline precludes an accurate assessment of an action's environmental impacts. *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1083–85 (9th Cir. 2011). Without accurate baseline information, there "is simply no way to determine what effect the [project] will

have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

83.    The "hard look" requirement also entails comprehensive consideration of *cumulative impacts* from the proposed action and similar pending or foreseeable agency actions in the same area. *Kleppe*, 427 U.S. at 409–410 & 410 n.21; *see Te-Moak Tribe of W. Shoshone v. U.S. Dept. of Interior*, 608 F.3d 592, 602–07 (9th Cir. 2010) (finding that BLM's EA for a mineral exploration project failed "to take a hard look at the cumulative impacts of the [exploration project and nearby existing or foreseeable projects]").

84.    The NEPA "hard look" also requires providing details on *mitigation measures* and their effectiveness. *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380–81 (9th Cir. 1998). "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective." *S. Fork Band Council of W. Shoshone v. U.S. Dept. of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). This allows an agency to "evaluat[e] whether anticipated environmental impacts can be avoided." *Id*. "A mitigation discussion without at least *some* evaluation of effectiveness is useless in making that determination." *Id*. "Putting off an analysis of possible mitigation measures until after a project has been approved, and after adverse environmental impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decisionmaking." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1107 (9th Cir. 2016).

85.    The BLM has violated NEPA through issuance of the 2025 DR, FONSI, EA, and project approval. These violations and arbitrary and capricious analyses and failures to analyze include but are not limited to:

    a.    Failing to prepare an EIS;

b.  Failing to take a hard look at impacts to sage-grouse, pygmy rabbit, and other species, including by focusing solely on acres directly affected and ignoring or downplaying functional habitat loss and other indirect impacts;

c.  Failing to take a hard look at and establish an accurate environmental baseline with regard to water contamination and water quantity issues;

d.  Failing to take a hard look at and establish an accurate environmental baseline with regard to the actual, on-the-ground conditions of the roads authorized for the project and the surrounding lands;

e.  Failing to adequately address mitigation and discuss in a meaningful way whether the vague, unenforceable, previously unsuccessful, and voluntary mitigation measures scattered in the EA will be effective in minimizing environmental damage from the project;

f.  Improperly minimizing or downplaying the environmental impacts of the project by classifying them as "temporary" when many impacts will in fact have long-lasting, even potentially permanent, effects; and

g.  Failing to consider the cumulative impacts of the project together with other existing or foreseeable mineral exploration and mining projects in the McDermitt Caldera.

86.  The 2025 DR/FONSI/EA and project approval therefore are arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, and has caused or threatens serious prejudice and injury to plaintiffs' rights and interests. The 2025 DR/FONSI/EA and project approval constitute final agency action(s) judicially reviewable by this Court pursuant to 5 U.S.C. §§ 704 and 706(2), and must be held unlawful and set aside.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT

### FAILURE TO SUPPLEMENT THE EIS

87.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

88.    When new information comes to light the BLM must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require a supplemental NEPA document.

89.    An agency must prepare a supplemental EA when there are significant new circumstances that change the underlying project or significant new information relevant to environmental impacts that the agency has not already considered. *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1069 (9th Cir. 2023).

90.    Further, the BLM must re-examine its decision when the NEPA document rests on stale scientific evidence or false assumptions. *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993). Agencies also must use "reliable data source[s]" and undertake additional analyses if "new scientific or technical research is essential to a reasoned choice among alternatives." 42 U.S.C. § 4336(b)(3). Failure to issue a supplemental NEPA document when these criteria are met is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA.

91.    Here, the BLM violated NEPA by failing to supplement the EA. This includes, but is not limited to, the BLM's failure to evaluate the significant new circumstances and information related to sage-grouse populations and habitat within the project area, and the State Director's unexplained decision not to conduct additional NEPA review and issue a supplemental NEPA document.

92.     The BLM also violated NEPA by failing to provide a reasonable and reasoned explanation for its decision not to supplement the EA and not to make available for public review and input any analyses the BLM may have made in the course of deciding to issue its decision without first supplementing, and its continuing failure to supplement.

93.     The BLM's failure to supplement the EA constitutes agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA, and has caused or threatens serious prejudice and injury to plaintiffs' rights and interests. BLM's failure to supplement the EA is judicially reviewable pursuant to 5 U.S.C. §§ 704 and 706(2), and must be held unlawful and set aside.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF FEDERAL LAND POLICY AND MANAGEMENT ACT

#### FAILURE TO PREVENT "UNNECESSARY OR UNDUE DEGRADATION," MANAGE "IN ACCORDANCE WITH" BINDING LAND USE PLAN REQUIREMENTS, AND ENSURE MEANINGFUL PUBLIC PARTICIPATION

94.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

95.     FLPMA requires the BLM to "develop, maintain, and . . . revise" land use plans in order to carry out the agency's obligations to manage the public lands "in a manner that will protect the quality of scientific, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and "preserve and protect certain public lands in their natural condition." 43 U.S.C. §§ 1701(a)(8), 1712(a)–(c); 43 C.F.R. § 1610.5-5. Once developed, BLM must manage the public lands "in accordance with" these land use plans. 43 U.S.C. § 1732(a).

96.     BLM must manage the public lands consistent with the "principles of multiple use and sustained yield" and "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(a), (b). BLM also must manage the public lands "without permanent impairment of the productivity of the land and the quality of the environment." *Id.* §

1702(c). "FLPMA's requirement that the Secretary prevent [unnecessary or undue degradation] supplements requirements imposed by other federal laws and by state law." *Ctr. for Biol. Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 644 (9th Cir. 2010). This duty is "the heart of FLPMA [that] amends and supersedes the Mining Law." *Min. Pol'y Ctr. v. Norton*, 292 F. Supp. 2d 30, 42 (D.D.C. 2003). BLM cannot under any circumstances approve a mineral exploration project that would cause unnecessary or undue degradation. 43 C.F.R. §3809.411(d)(3)(iii).

97.    As part of its duty to prevent unnecessary or undue degradation, BLM must ensure that all operations comply with "Federal and state laws related to environmental protection and protection of cultural resources" and with regulatory "performance standards." *Id*. § 3809.5 (definition of "unnecessary or undue degradation"). The performance standards include mitigation and reclamation requirements, minimization of access routes, appropriate waste disposal, air, water quality and habitat protections, cultural resource protections, and other requirements *Id*. § 3809.420.

98.    In addition to the ARMPA requirements noted above for sage-grouse, as part of its duty to prevent unnecessary or undue degradation, the BLM has established national policy and guidance, adopted in the agency's Manual 6840 ("Special Status Species Management"), for the conservation of BLM special status species and the ecosystems upon which they depend on BLM-administered public lands. BLM special status species are (1) species listed or proposed for listing under the ESA and (2) other species designated as "Bureau sensitive" by BLM State Directors that require special management consideration to promote their conservation and reduce the likelihood and need for future listing under the ESA.

99.    The objectives of BLM's special status species policy is to "conserve and/or recover ESA-listed species and the ecosystems on which they depend so that ESA protections are

no longer needed for these species," and, for other species designated as Bureau Sensitive Species, "[t]o initiate proactive conservation measures that reduce or eliminate threats" to such species "to minimize the likelihood of and need for listing of these species under the ESA."

100.    FLPMA underscores the importance of science-based land management and decisionmaking. To ensure it has adequate information to fulfill its FLPMA obligations, BLM must "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values." 43 U.S.C. § 1711(a). This inventory "shall be kept current so as to reflect changes in conditions." *Id*.

101.    In regulations adopted to further implement FLPMA, the BLM emphasizes that "to advance [its] multiple use and sustained yield mission by prioritizing the health and resilience of ecosystems across public lands" the agency "will protect intact landscapes, restore degraded habitat, and make informed management decisions based on science and data." Conservation and Landscape Health, 89 Fed. Reg. 40,308, 40,308 (May 9, 2024) (rule codified at 43 C.F.R. Part 6100, and also emphasizing that "conservation is a use on par with other uses of the public lands" as part of BLM's multiple-use mission). The purpose of these "ecosystem resilience" regulations "is to promote the use of conservation to ensure ecosystem resilience and prevent permanent impairment or unnecessary or undue degradation of public lands." 43 C.F.R. § 6101.1. The ecosystem resilience regulations, 43 C.F.R. Part 6100, were in effect at the time BLM published the EA, FONSI, and DR challenged in this case.

102.    FLPMA also requires the BLM to ensure a full and meaningful public review and the public's ability to participate in the management of public lands. For example, FLPMA provides that "[t]he Secretary shall, *with public involvement* and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans." 43

U.S.C. § 1712(a) (emphasis added). To "allow an opportunity for public involvement," the Secretary must establish procedures that allow the public "to comment upon and participate in the formulation of plans and programs relating to the management of the public lands." *Id*. § 1712(f). "Public involvement" is defined to include "the opportunity for participation by affected citizens in . . . decisionmaking . . . with respect to the public lands." *Id*. § 1702(d). Agency procedures must give "the public adequate notice and an opportunity to comment upon," and ensure the public's ability "to participate in, the preparation *and execution of* plans and programs for, *and the management of*, the public lands." *Id*. § 1739(e) (emphasis added). FLPMA's public participation requirement applies to "individual land use decisions" which implement BLM's land use plans, such as the mineral exploration project decision at issue here. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 40 (9th Cir. 2025).

103.    The BLM has violated FLPMA and implementing regulations through issuance of the 2025 DR/FONSI/EA and project approval. These violations include but are not limited to:

   a.   Failing to prevent unnecessary or undue degradation of public lands and resources, including failing to provide a reasoned explanation supporting its determination that there will not be any unnecessary or undue degradation to public resources, including BLM-designated Sensitive Species and their habitats, as a result of the agency's decision to approve the McDermitt Exploration Project;

   b.   Failing to provide for public involvement in the decisionmaking for, and execution of and management of public lands with respect to, the agency's decision to approve the McDermitt Exploration Project;

   c.   Failing to manage the public lands in accordance with the governing land use plan, the SEORMP, as amended by the 2015 ARMPA, which requires that the

BLM conserve (not sacrifice) sage-grouse populations and habitat, including by requiring, among other things, that BLM—

    i.    "shall not" allow activities disruptive to sage-grouse in seasonal habitats unless BLM demonstrates that the activities will not impair the life-cycle or behavioral needs of sage-grouse (MD SSS-11);

    ii.    prioritize vegetation management and conservation actions in Sagebrush Focal Areas (MD SSS-2);

    iii.    not upgrade existing roads or construct new roads that contribute to sage-grouse mortality or lek abandonment, or upgrade or change the maintenance level of any primitive roads within 4.0 miles of sage-grouse leks (MD TTM 3, MD TTM 8);

    iv.    require and ensure mitigation that provides a "net conservation gain" for any action that results in habitat loss and degradation (MD SSS-10, MD SSS-13, MD MR 11); and

    v.    maintain or improve habitat connectivity within Oregon and adjoining states to promote sage-grouse movement and genetic diversity (MD SSS-12).

104.    The 2025 DR/FONSI/EA and project approval therefore are arbitrary, capricious, an abuse of discretion, and not in accordance with FLPMA, and have caused or threaten serious prejudice and injury to plaintiffs' rights and interests. The 2025 DR/FONSI/EA and project approval constitute final agency actions judicially reviewable by this Court pursuant to 5 U.S.C. §§ 704 and 706(2), and must be held unlawful and set aside.

//

//

COMPLAINT
- 48 -

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.    Order, declare, and adjudge that defendants' December 8, 2025 Decision Record and the accompanying FONSI, EA, and project approval are unlawful under, and in violation of, NEPA, FLPMA, and the APA;

B.    Order, declare, and adjudge that defendants' failure to supplement the 2025 EA and cursory denial of the regulatory State Director review request for further analysis and a supplemental NEPA document was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

C.    Issue an order setting aside and vacating defendants' December 8, 2025 Decision Record and the accompanying FONSI, EA, and project approval;

D.    Enter injunctive relief barring defendants from implementing or further implementing the December 8, 2025 Decision Record and accompanying FONSI, EA, and project approval, unless and until such time as defendants have completed a lawful environmental analysis and issued a new, lawful decision that complies with the requirements of the APA, NEPA, and FLPMA, including preparing a new NEPA and FLPMA analysis, as well as any further injunctive or other relief necessary to mitigate for any resource-damaging or - threatening actions taken prior to this Court's issuance of a decision on plaintiffs' claims;

E.    Award plaintiff its reasonable costs, litigation expenses, and attorney fees associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and all other applicable authorities; and

E.    Grant such other further relief as plaintiff may request or the Court deems just and proper.

DATED this 27th day of April, 2026.                    Respectfully submitted,

s/ Peter M. Lacy

_____

Peter M. ("Mac") Lacy
Oregon Natural Desert Association

Roger Flynn (CO Bar # 21078)
 (*Pro Hac Vice Application to be Submitted*)
Western Mining Action Project

Attorneys for Plaintiffs